# CONSULTING PROJECT

## PRE-SENTENCE MEMORANDUM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-vs.-

Joseph M. Codd
Docket # 20CR00534-001(BMC)

HONORABLE JUDGE BRIAN M. COGAN

Jack Dennehy
Assistant United States Attorney
United States Attorneys Office
Eastern District of New York

Respectfully submitted,

Mandi Budah, MA, LCSW
Forensic Social Work Consultant

Reynaldo Cusicanqui, B.A.
Forensic Mitigation Specialist
CONSULTING PROJECT

Patrick J. Brackley, Esq.
233 Broadway Suite 801
New York, New York 10279
DEFENSE COUNSEL

August 25, 2021

1

**CONTENTS**

INTRODUCTION…………………………………………………....................................Pg. 4

BIOPSYCHOSOCIAL HISTORY……………………………………………………..Pg. 8

EDUCATION AND VOCATIONAL HISTORY…………………………...…………...Pg. 11

MEDICAL AND PHYSICAL HEALTH HISTORY……… ..……..……………..............Pg. 12

ALCOHOL AND SUBSTANCE USE HISTORY…..……………………………...........Pg. 13

LEGAL HISTORY…………………………………………………………………..Pg. 22

MENTAL HEALTH HISTORY………………………………….…..………………...Pg. 23

COLLATERAL INTERVIEW WITH JOANN CODD………………………..……………...Pg. 24

COLLATERAL INTERVIEW WITH THOMAS KAHIL…………...……………………Pg. 27

COLLATERAL INTERVIEW WITH MAURA CODD…...……………………………Pg. 28

CLINICAL ASSESSMENT…….…………………………...….……………...............Pg. 29

RELEVANT RESEARCH RELATED TO MITIGATING FACTORS…………………Pg. 30

IMPACT OF COVID 19 ON BOP INCARCERATION…………………………………Pg. 37

SENTENCING RECOMMENDATIONS…………...…...……….…………...............Pg. 40

EXHIBITS:
1. Demographic Information
   a. Certificate of Birth – July 29, 1987
2. Childhood and Educational Accomplishments
   a. Our Lady Star of the Sea
      i. Altar Service Recognition
      ii. Social Studies Achievement Award – June 1999
      iii. Physical Fitness Outstanding Achievement Award – 1999
      iv. Perfect Attendance Award – June 1999
      v. Diploma – June 2001
      vi. Tottenville High School Diploma – June 2005
3. Treatment Records
   a. Transitions Recovery Program
      i. Letter confirming admission- dated July 2019
      ii. Admissions Assessment – December 19, 2018

      iii.  Psychiatric Evaluation – December 19, 2018
      iv.  Medical Admissions Assessment – December 19, 2018
      v.  Clinical Admissions Assessment – December 20, 2018
      vi.  History and Physical – December 21, 2018
      vii.  Continuation of Treatment Letter – July 25, 2019
      viii.  Transfer Summary – February 18, 2019
      ix.  Physician Discharge Orders – February 19, 2019
      x.  Clinical Discharge Assessments – November 15, 2019
- b. YMCA Counseling Service
  - i. Confirmation of Treatment Letter
  - ii. Admissions Assessment
  - iii. Treatment Plan
  - iv. Discharge Summary
- c. Dade Family Counseling Anger Management Certificate of Completion – November 2019
- d. Parenting Wisely Certificate of Completion – March 2020
4. OSHA 10 Hour Outreach Training Program Certificate of Completion – November 2017
5. Kevin Codd – Federal Bureau of Investigations Recognition for Assistance with the World Trade Center Recovery – September 2001-July 2002
6. Letters of Support
   - a. JoAnn Codd – Mother
   - b. Kevin Codd – Father
   - c. Maura Codd – Sister
   - d. Erica Aylward – Stepsister
   - e. Pamela Moschella – Godmother and mother's best friend
   - f. Laurie Cataneo – Aunt
   - g. Michelle Midura – Family friend
   - h. James Midura – Family friend

**INTRODUCTION**

This pre-sentence memorandum has been prepared by the Consulting Project, a private mitigation and forensic social work firm that assists defense attorneys with evaluations of individual clients and cases with a view toward presenting alternative pleas and sentencing possibilities to the U.S. District Courts and the United States Attorney's Office. This memorandum is submitted by Reynaldo Cusicanqui, BA and Mandi Budah, MA, LCSW on behalf of Joseph Michael Codd, at the request of his attorney, Patrick J. Brackley, Esq.

Mr. Cusicanqui has worked as a Forensic Mitigation Specialist and Sentencing Advocate since 1995. Due to his lengthy experience, he has knowledge of psychosocial contributors and extensive knowledge of criminal behavior derived from evaluating thousands of defendants in the state and federal court systems throughout his career. He has also gained most of his forensic experience in mitigation from being appointed as a Senior Mitigation Specialist on numerous death penalty eligible matters in the United States District Court for the Southern and Eastern Districts of New York. I, Mandi Budah have worked as a Licensed Clinical Social Worker since 2012 and additionally possess a master's Degree in Forensic Psychology, obtained in 2010. With my knowledge of psychosocial contributors and comprehensive knowledge of criminal behavior obtained from working with the Consulting Project, I conduct evaluations, prepare Pre-pleading and Pre-sentence reports for the court, and recommend necessary sentencing alternatives on criminal matters. It is our specialty to provide the greatest amount of biopsychosocial background to the decision-making parties. This ultimately allows us to identify specific mitigating factors that are related to the offense and then a presentation of the past and present character of a defendant that is deserving of a just and appropriate disposition.

This pre-sentence memorandum was prepared at the time of the COVID epidemic, hence there was limited resources/availability in meeting with Mr. Codd in person, therefore the

detailed information contained herein is based on multiple video interviews and one in person meeting with Mr. Codd, who is detained at the Metropolitan Detention Center. We also conducted collateral phone interviews with his mother, Joann Codd, his sister, Maura Codd, and his childhood friend, Thomas Kahil.  Employment and treatment information was verified via phone with Tim McMarrow (treatment intervention) and Craig Paul (employment verification) and additional treatment records and supporting documentation have been obtained, reviewed and attached herein.

During the multiple interviews and his clinical assessment, Mr. Codd presented with a history of multiple adverse experiences and trauma, including being falsely accused of a crime during adolescence at the age of 15, the murder of his best friend, an accident that resulted in a broken back and subsequent opiate addiction, and a divorce that lead to losing custody of his daughter, which markedly impacted his development, identity formation, and coping skills. These experiences precipitated unbalanced emotional states and compromised later judgment and global decision making.  Early childhood experiences additionally led to the development of an anxiety disorder.  This memorandum will elucidate this determination and highlight in detail mitigating factors we believe deserve consideration in determining the most appropriate sentence.

In presenting this memorandum, we wish to highlight certain mitigating factors that we believe promote a just and appropriate sentence and respectfully recommend that Mr. Codd be sentenced to a period of incarceration that is no greater than necessary. These mitigating factors are:

- Healthy neurodevelopment was impaired in utero due to prenatal maternal anxiety.

- Mr. Codd has a history of complex trauma which resulted in development of emotion regulatory problems, and increased risk for substance use, poor decision-making, and impulsivity.

- Utilization of negative peer groups during critical developmental stages undermined his social development and negatively impacted decision-making and problem-solving skills as an adult.

- Following an accident that resulted in a broken back, Mr. Codd became addicted to opiates, which he utilized as a maladaptive coping strategy, directly impacting brain structures and functions associated with decision-making, reasoning, and judgment.

- As a result of early life stress and substance use disorder, Mr. Codd has an abnormal response to stress, deficits in attention and frontal lobe functioning, as well as impaired neurocognitive functioning and impairment in the prefrontal cortex, the key region associated with decision-making.

- Mr. Codd attempted to resolve his severe addiction by entering into multiple modalities of substance abuse treatment but later relapsed due to strenuous and complicated relationship with his wife leading to a separation and subsequent divorce.

- There is a history of mental illness, including diagnosis of anxiety disorder, which was not treated as a co-occurring disorder during any of his contact with substance abuse treatment providers.

- Mr. Codd's divorce, which was strenuous and chaotic, severely compromised his ability to regulate emotions, stay sober and ; Unbalanced emotional states led to a maladaptive response to stress, including relapse, impulsivity, and poor judgment.

6

- The psychological and psychosocial impact of his divorce, loss of custody of his daughter, and relapse, followed by an increase and combination of multiple drugs contributed to his lapse in judgment, decision-making, and the present criminal conduct.

- There is a history of successful completion of substance use inpatient treatment an admission into outpatient treatment in April 202, but a lack of follow up due to the commencement of the COVID pandemic in March 2020.

- There is a willingness to adhere to all aspects of a proposed treatment plan, based on request to gain assistance and his cooperation with the mental health staff at Metropolitan Detention Center (MDC).

- There is now a specific psychological evaluation and a formal recommendation of psychotropic medications that have been prescribed to Mr. Codd at Metropolitan Detention Center (MDC).

- Mr. Codd has taken responsibility for his actions and accountability has been stimulated.   Since being incarcerated he has remained free from disciplinary infractions and is employed as an orderly in MDC.

- Mr. Codd's risk for recidivism will be higher should he be sentenced to a lengthy period of incarceration; he struggles with mental illness and a substance use disorder, both of which are best addressed in a structured treatment program, which can be mandated soon after a term of limited incarceration.

- A lengthy period of incarceration will place Mr. Codd at risk for institutionalization, and weaken his interpersonal, economic, and familial bonds, increasing his propensity for recidivism after release.

**BIOPSYCHOSOCIAL HISTORY**

Joseph Michael Codd was born without complication to the marital union of Joann Codd (age 66) and Kevin Codd (age 72) on July 29, 1987, at St. Vincent's Medical Center, on Staten Island, New York. He has two biological siblings, Kevin Jr. (age 35), who is a Local 3 electrician and resides on Staten Island, and Maura (age 38), who is a teacher on Staten Island. He has two paternal half-sisters, Tracey Codd-Lorenz (early 50's), who resides in Florida and works for Expedia, and Erica Codd (late 40's), who also resides in Florida and is a registered nurse. Mr. Codd has one daughter, Ava ( age 4) who lives on Staten Island with her mother, Victoria Codd (nee O'Connell) (age 33), Mr. Codd's ex-wife. Mr. Codd denied being in a current relationship and has no other children. Prior to the instant offense, he was residing in Staten Island, New York, with his parents.

Mr. Codd reportedly was born with infant asthma that subsided with no residual complications or effects. He reported all developmental milestones were reached within normal limits, including walking and talking. He described growing up on Staten Island in a home with his parents and two siblings. His half-sister Erica lived with the family until Mr. Codd was approximately 10 years of age. He described a good childhood, reporting a close an active neighborhood where he always had the opportunity to ride bikes, play in the woods, or play in the streets. He described a close-knit neighborhood, stating many of his parents' friends became family and were "all aunts and uncles," ensuring there was always an adult figure around to care for him and his siblings. Mr. Codd reported his mother worked typical hours but during childhood, was attending night school, working towards becoming a NYC Board of Education Vice Principal. His father worked long hours as the Deputy Director of Landfills for the NYC Department of Sanitation. Despite both parents demanding positions, Mr. Codd remembered his

parents being present in his life, in addition to spending time with many babysitters throughout his childhood.

Mr. Codd described an unremarkable childhood until the age of 15, when he experienced significant trauma, which sent him through a downward spiral. This commenced when he was arrested and falsely accused of attempted murder.  Mr. Codd and his family tirelessly spent two and half years fighting for his innocence in court, where the media forced him into the public eye and characterized him as a "monster."  Mr. Codd was ultimately exonerated in early 2004, two years later of his charges, but not without long lasting mental health consequences and negative effects.  He was forced to change high schools, he and his family received death threats, his view of the world was negatively impacted, his social identity was hindered, and his emotional development was blocked. Despite all the negative experiences he was exposed to, he continued school and graduated.

Mr. Codd described his false arrest and going through the "system" as a "traumatic" experience that served as a "turning point" in his life.  He became defensive, withdrawn, nervous, fearful, apprehensive, and began using drugs and alcohol to cope with the stress. In 2005, almost a year after his exoneration, Mr. Codd was arrested at the age of 18 for an assault and incarcerated for one year, shortly after he graduated high school. At the age of 21, he suffered a broken back in a dirt bike accident, which eventually led to an opiate addiction.  In March 2012, when Mr. Codd was 25 years of age, his best friend, Anthony Lacertosa was murdered outside of a restaurant where he celebrating his engagement.

At the age of 26 Mr. Codd realized that he required assistance for his drug use, hence he began his journey to sobriety which included two inpatient rehabilitation and sober housing episodes.  Shortly after Mr. Codd completed inpatient rehabilitation, he met his ex-wife,

Victoria, through mutual friends.  He described a rapid progression of their relationship. Since he was financially stable at the time he was able to move of out of his parents' home to reside with Victoria.  They were married in 2016, their daughter was born in 2017, and they separated the same year.  He reported prior to their daughter's birth, he purchased and renovated a home, and described he was in a "really good place."  Ms. Codd reportedly suffered postpartum depression and Mr. Codd reported her personality and behavior continued to change and worsen. Approximately 8 months after Ava was born, they separated.  Mr. Codd detailed a challenging divorce.  He reported his daughter was taken from him, "losing custody", he was forced to sell the house and out of the profits he made by selling the home he paid Victoria $90,000, then he was only granted supervised visits, and had a restraining order in family court.  He described feeling overwhelmed, depressed, and "extreme pressure all day, every day."  Despite this, he maintained employment, maintained compliance with probation, completed parenting and anger management classes, attended all court appearances, and remained compliant with child support payments.

As he tried to regain his confidence and rebuild his life, Mr. Codd again made the decision to seek inpatient rehabilitation, which he located in Florida via friend who he had met in his early attempts at treatment. He commenced treatment by entering into a short term rehabilitation program, then followed by a half way house, which allowed him to reside in a drug free environment and work. He obtained employment with as a delivery man of a Boars Head route in Florida.  Once he successfully completed all of the modalities of treatment, he returned home to New York and began participating in outpatient substance use programming at YMCA in Staten Island, as a condition of family court to regain custody of his daughter.  Mr. Codd reported programming was suspended during the COVID-19 pandemic.  It is important to note

that only in-person programming was suspended, and sessions were continued via phone and zoom, but Mr. Codd claims he was not aware of the availability to continue treatment virtually. He reported struggling with a lack of support and weekly toxicology screens, and he ultimately relapsed, leading to the instant offense.  Additional details on the information contain in his section can be found in the substance use history section of this report.


**EDUCATION AND VOCATIONAL HISTORY**

Mr. Codd attended Our Lady Star of the Sea, a private Catholic educational institution for elementary and middle school.  He excelled in the school achieving many awards and a subsequent diploma. He remembered attending school with many affluent families, despite his being a blue collar family, and often felt out of place and like he did not belong.  He reported being "chubby" during childhood and recalled a history of being "picked on," resulting in him "hanging out with the outcast crowd."  He denied all behavioral and academic issues.

He attended the Monsignor Farrell High School, a Catholic all-boys high school for his freshman year, before being "kicked out due to negative behavior".  His sophomore year of high school, he attended the New Dorp High School, his first experience in a public educational setting.  Halfway through his sophomore year, Mr. Codd was arrested and falsely accused of attempted murder, and spent the next couple of years in court and in the public eye.  He ultimately was unable to return to New Dorp High School due to death threats and feeling unsafe.  He transferred to Tottenville High School and graduated in 2005, at the age of 18.

Since the age of 19, Mr. Codd has been employed in food distribution.  From 2006 through 2016, with the exception of the term of his motorcycle injury, he was working for Garden State Provisions, a distributor of Boar's Head Premium Deli Meats and Cheeses, where

he worked from 1:00AM through 3:00PM four days weekly.  In 2016, he began working for Jersey's Finest Food Service, a freight shipping and trucking company that operates also as a distributor of Boar's Head Premium Deli Meats and Cheeses.  During a telephone conversation with Craig Paul, Mr. Codd's supervisor, it was confirmed that Mr. Codd been employed with the company since 2016 and "took some time off" during his divorce in 2019.  He never returned to work due to his addiction, mental health and subsequent instant offense.


**MEDICAL AND PHYSICAL HEALTH HISTORY**

At the age of 21, Mr. Codd sustained a broken back following a dirt bike accident.  He reportedly suffered injury to T11, T12, and L1 vertebras.  He was hospitalized at Staten Island Hospital South and transferred to Staten Island Hospital North.  Mr. Codd did not undergo surgery and checked himself out of the hospital against medical advice.  He did not follow up with after care or physical therapy; he sought out pain management options.  He was under the care of Dr. Nkanga U. Nkanga, who prescribed Mr. Codd Oxycodone, six 30mg pills daily.  In 2019, Dr. Nkanga was arrested on narcotics conspiracy and distribution charges,[1] therefore medical records are unable to be obtained.

There are current paternal significant medical issues and concerns.  Mr. Codd's father, Kevin, served as Deputy Director within the Department of Sanitation during the September 11, 2001 attacks on the World Trade Center.  He was recognized by the Federal Bureau of Investigations for his meritorious and dedicated service during the forensic recovery of the World Trade Center debris at the Fresh Kills Landfill, in Staten Island, New York, from September 2001 through July 2002.  As a result, he has suffered innumerable medical

---

[1] United States Attorney's Office Southern District of New York. (October 21, 2019). Staten Island Doctor Pleads Guilty to Illegally Distributing Oxycodone. Retrieved from: https://www.justice.gov/usao-sdny/pr/staten-island-doctor-pleads-guilty-illegally-distributing-oxycodone-1

consequences in conjunction with a past medical history.  In a Mount Sinai Hospital progress note dated September 3, 2020, Mr. Kevin Codd presented with primary history of COPD, bilateral carotid stenosis s/p right carotid bypass and endarterectomy, right retinal artery embolus with right eye blindness, and benign prostatic hyperplasia.  In 2019, he had a fibroelastoma removal and has since been complaining of worsening shortness of breath.  He presents with cough, phlegm and wheezing, and requires increased use of a rescue inhaler.  Mr. Kevin Codd has severe Emphysema and is now dependent on Oxygen.  He is prescribed four different inhalers for relief, in addition to aspirin and blood pressure medication.  His wife, Mrs Joann Codd is his sole caretaker.


**ALCOHOL AND SUBSTANCE USE HISTORY**

Mr. Codd admitted to being severely impacted by his arrest and legal crisis at age 15, which is when he described the onset of a significant substance use history that began in the latter part of the year with weekend use of alcohol, marijuana, and Xanax, and first use of cocaine at the age of 16.  Mr. Codd reported he smoked marijuana on the weekends, and though his rate of use never progressed, his early onset of use may have implications for later dysfunction.  His reported last use of marijuana was approximately 4 years ago.

Following a broken back at the age of 21, Mr. Codd was reportedly prescribed Oxycodone for pain, for which he was prescribed six 30mg pills daily.  Prior to his injury, there was no history of opiate use.  Mr. Codd quickly developed a tolerance to and dependence on Oxycodone and his rate of use over the next several years increased to 10-20 pills daily. He reported using an excessive amount of pills daily for approximately 6 months to one year before entering treatment.  Mr. Codd reported regular use of alcohol but denied significant consumption

until he separated from his wife, reporting increased use of Scotch to four days weekly, approximately 4-6 drinks each day, including use the night before the instant arrest.  He reported minimal use of cocaine during adolescence and increased use in his mid-20's, reporting approximately 1 gram on the weekends.

Mr. Codd reportedly increased his use of alcohol and pain medication following his separation. Mr. Codd described using 2mg Xanax and cocaine on the weekends.  Four months prior to the instant offense, he was under the psychiatric care of Dr. Leon Valbrun for increasing anxiety stemming from the separation from his wife, who reportedly prescribed 4mg of Xanax daily, in addition to 30mg of Adderall daily.  He withdrew from Xanax while incarcerated at MDC and was prescribed Klonopin for two weeks with no reported adverse reactions.

Mr. Codd denied any period of substantial abstinence in the community, noting alcohol use immediately after completing treatment programs.  Mr. Codd reported a significant increase in alcohol and cocaine, surrounding his separation and divorce from his wife, leading to periods of desperation and confusion.

***Substance Abuse Treatment History***

Mr. Codd reported he first attempted to resolve his addiction in his "early 20's" by entering into the inpatient rehabilitation unit at Veritas Villas, located in New York.  At the age of 26, he attended and completed inpatient rehabilitation at the Fort Lauderdale Addiction Treatment Center (August 12 through September 10, 2013), with 6 months of follow up care at the Freedom House North, a sober living community in Hollywood, Florida.  During his time there, a second facility was opened, Freedom House South, in North Miami Beach, Florida, where he transferred for an additional two months.   Various treatment records were not

attainable since much time has passed, but according to health insurance review information obtained and attached herein, while in treatment, Mr. Codd attended programming five days per week, six hours daily, including "treatment with intensive services, sober housing, and outside meetings.  He made satisfactory progress and completed the program with discharge to clinically appropriate aftercare and return home." However in late 2018, he had a severe (also known as polysubstance abuse) relapsed and therefore in December 2018, at the age of 31, Mr. Codd again entered treatment.

Based on information provided and the records obtained and attached herein, he attended The Detox Center in West Palm Beach, Florida, from December 13-19, 2018. Mr. Codd was admitted to Transitions Recovery Rehab Unit of the Program on December 19, 2018; he completed residential treatment on February 7, 2019, and completed their intensive outpatient program on November 15, 2019.   While in Transitions Recovery Program, Mr. Codd was diagnosed with alcohol use and cocaine use disorders, both severe and was prescribed Trazadone and Vistaril, for sleep and anxiety. According to a letter from Marian Bach, Clinical Director, Mr. Codd's treatment plan included work on the following topics: substance use education, dual diagnosis, medication education, relapse prevention, low self-esteem, grief, and unresolved loss. After six months of treatment, he made "considerable progress in the areas of working on denial, lack of coping skills, knowledge of the disease" and had "integrated well into the therapeutic community."   He additionally participated in individual counseling sessions and 12-step meetings.  While attending Transitions Recovery Program intensive outpatient program, Mr. Codd resided in Freedom House South sober living community (from February 22, 2019, through November 15, 2019) before returning to New York.

In a telephone conversation with Mr. Kendall Westmoreland, the owner of Freedom House, it was confirmed that Mr. Codd was a resident in both the Hollywood and Miami Beach locations. Mr. Westmoreland reported there were no records kept beyond a lease agreement. He reported the Miami Beach location has been closed and sold, and all records have been destroyed. He further confirmed any lease agreement from the Hollywood location has also been destroyed, due to the length of time that has passed.

According to a telephone conversation with Timothy McMarrow, Mr. Codd first attended treatment in 2012, where the pair met while in a halfway house. Mr. McMarrow was integral in Mr. Codd's second treatment episode at Transitions Recovery Program in 2019. Mr. McMarrow reported being on vacation in New York when he received a call from Mr. Codd, needing help. Mr. McMarrow secured him a bed at The Detox Center in West Palm Beach, Florida, before helping with his admission to Transitions Recovery Center. He reported Mr. Codd additionally spent time at the same halfway house, which has since closed.

Following his return home to New York, Mr. Codd was informed that his ex-wife had filed for and was awarded full custody of their daughter. The court required him to enroll and participate in aftercare treatment as a condition of his parenting rights. Mr. Codd enrolled in outpatient substance use treatment at the YMCA of Greater New York, located in Staten Island, New York. He completed an admission assessment on February 15, 2020 and began participating in weekly group and individual sessions on March 11, 2020. He was under the care of Michael Marchiano, CASAC-T, his primary counselor. While in treatment, he was diagnosed with cocaine use disorder, severe, in sustained remission. Mr. Codd worked to develop relapse prevention skills, develop healthy family relationships, and resolve legal issues. According to records obtained and attached herein, Mr. Codd complied with all program rules, passed all

16

toxicology screens, but did not complete the program.  He achieved his addiction goal and partially achieved his family and legal goals.  He was discharged on July 28, 2020, as he "left against clinician advice" and was "lost to contact."  No referral was made.  According to the YMCA, during the COVID-19 pandemic, programming remained available to all participants. Group and individual sessions were offered via phone and telehealth, but Mr. Codd was unaware of the alternatives.

It is important to note that despite successful completion of treatment episodes, Mr. Codd reported never attending treatment on his own accord, for his wellbeing or in stable periods of his life.  He described attending treatment at low points of his life and also at the request of his mother and other family members who were concerned for him, which may help to explain his history of relapse and minimal periods of abstinence.  He presently understands that he needs to commit to treatment for the rest of his life and for his wellbeing and not of others.

### *Relevant research on substance use and impact on the brain*

Substance dependent individuals (SDI) suffer from a decision-making impairment similar to that seen in patients with lesions of the ventromedial (VM) prefrontal cortex.  Individuals with developmentally abnormal function in cortical mechanisms critical for decision-making, response inhibition, and the control of behavior are more susceptible to pursuing actions that are rewarding in the short term, even when these actions lead to deleterious consequences in the long term.[2]  Mr. Codd's actions the night of the instant matter demonstrate his poor decision making and impulsivity, given he lacks a history of similar behaviors.

---

[2] Bechara, A., & Damasio, H. (2002). Decision-making and addiction (part I): impaired activation of somatic states in substance dependent individuals when pondering decisions with negative future consequences. *Neuropsychologia*, *40*(10), 1675-1689.

Cannabis continues to be the most widely used illicit substance in the United States and has been associated with cognitive impairments, including difficulties with executive function, psychomotor speed, memory, learning, processing speed, and sustained attention, with some deficits continuing even after periods of abstinence. Both cannabis use and its related consequences have been linked to certain physical health outcomes such as respiratory dysfunction as well as mental health problems, including anxiety and depression.[3] Earlier age of onset, particularly during adolescence, may be linked to potential long-term cognitive deficits, including poor executive functioning and decision-making problems, which are evident in the events of the instant matter of Mr. Codd.

According to national surveys, prescription medications, such as those used to treat pain, attention deficit disorders, and anxiety, are abused only at a rate second to marijuana among illicit drug users.[4] Central Nervous System (CNS) depressants, including benzodiazepines, act on the brain by affecting the neurotransmitter gamma-aminobutyric acid (GABA), inhibiting brain activity and producing a drowsy or calming effect.[5] Individuals who misuse benzodiazepines typically do so for the analgesic effects which can be used to mitigate the same symptoms the drug is prescribed for clinically. Additionally, "emotional amnesia" occurs in addicts who become progressively more incapable of tolerating their emotions and life stressors, which may be a desired state for individuals who lack pro-social coping mechanisms. Mr. Codd admitted to using Xanax to cope with mood and anxiety even before he was prescribed the medication, and additionally used Xanax the night before the instant offense. Benzodiazepines produce a large and varied number of adverse effects due to the wide distribution of receptors

---

[3] Struble, C.A., Ellis, J.D., Cairncross, M., Lister, J.J., & Lundahl, L.H. (2019). Demographic, cannabis use, and depressive correlates of cannabis use consequences in regular cannabis users. *The American Journal on Addictions*, 28, 295-302.
[4] Volkow, N. D. (2005). Prescription drugs: Abuse and addiction. *National Institute on Drug Abuse*.
[5] Volkow, N. D. (2005). Prescription drugs: Abuse and addiction. *National Institute on Drug Abuse*.

found in areas including the spinal cord, cerebellum, limbic areas, and the cerebral cortex.[6]  As a result, long-term benzodiazepine use, especially use that is not monitored by a physician, is associated with significant impairments in concentration and attention, verbal learning difficulty, complex tasks and cognitive function, as well as memory impairment, depression and emotional blunting.[7]

Long-term use of opiates causes changes to the prefrontal cortex and medial temporal lobe of the brain.  These areas control and regulate long-term memory, decision-making, thought processes and social behaviors.   Brain alterations from long-term opiate use can cause the following behavioral changes: poor regulation of one's behaviors, impaired emotional processes, flawed reasoning skills, poor problem-solving skills and reduced decision-making skills.[8]

The use of cocaine, prescription amphetamines and methylphenidate (which are referred to as "stimulants") for non-medical purposes by young adults to enhance performance in academic and/or social situations poses an increasing public health problem. Up to 16% of individuals experimenting with cocaine develop dependence within 10 years.  Exposure to drugs of abuse particularly during brain maturation in adolescence and young adulthood increases the risk of future dependence,[9] as in the case of Mr. Codd, who began using cocaine at the age of 16 and reported significant increase in use in his mid-20's.  Cocaine use disorder is associated with several serious risks, including health problems, increased mortality, homelessness, overdose,

---

[6] Barker, M. J., Greenwood, K. M., Jackson, M., & Crowe, S. F. (2004). Cognitive effects of long-term benzodiazepine use. *CNS drugs*, *18*(1), 37-48.

[7] Barker, M. J., Greenwood, K. M., Jackson, M., & Crowe, S. F. (2004). Cognitive effects of long-term benzodiazepine use. *CNS drugs*, *18*(1), 37-48.

[8] Rehab After Work (2017, February 8). How do opioid drugs affect the brain?  Retrieved from https://rehabafterwork.pyramidhealthcarepa.com/opioid-drugs-affect-brain/

[9] Raske, M. Stewart, J., Flagan, T. & Paulus, M. (2015). Attenuate neural processing of risk in young adults at risk for stimulant dependence. *PLoS ONE*, 10(6), 1-23.

incarceration, violence, unemployment, and relapse,[10] several of which Mr. Codd has already experienced or been exposed to.

Two factors have consistently been identified as contributors to cocaine-dependence and use. One of these is exposure to life stress. Exposure to chronic stress, and enduring repeated trauma that began early in life is associated with developing a substance use disorder. In regard to cocaine, self-medication may be the result of strong relations between psychological stress and craving for cocaine. In fact, there is a dose-dependent relationship between the amount of exposure to lifetime stress and severity of cocaine use. This suggests that one reason people use substances is to cope with stressful life events, which helps to explain Mr. Codd's increased use correlating with increased times of stress. Another key factor that plays a large role in drug initiation and use is impulsivity. Impulsivity may promote drug use in several ways. For one, drug users may prefer the immediate rewarding effects of drug consumption over the long-term benefits of abstaining, such as enhanced socio-economic status, diminished relationship conflict, and improved health. Impulsive individuals also have more difficulty ignoring drug cravings, as they tend to have impaired inhibitory restraint and attentional control.[11]

Though life stress and impulsivity have been studied as independent predictors of substance use in past studies, recent reports suggest that impulsivity and exposure to life stress interact with one another to create a generalized susceptibility to cocaine abuse and dependence. Furthermore, some researchers speculate that the role of environmental influences on the development of impulsive traits has previously been understated. Research states that exposure

---

[10] E. Ross, J. Yoon, J. Mahoney III, Y. Omar, T. Newton & R. De La Garza II. (2013). The impact of self-reported life stress on current impulsivity in cocaine dependent adults. *Progress in Neuro-Psychopharmacology & Biological Psychiatry,* 46, 113-119.
[11] E. Ross, J. Yoon, J. Mahoney III, Y. Omar, T. Newton & R. De La Garza II. (2013). The impact of self-reported life stress on current impulsivity in cocaine dependent adults. *Progress in Neuro-Psychopharmacology & Biological Psychiatry,* 46, 113-119.

to particular environmental circumstances earlier in life can influence adulthood impulsivity in decision-making, especially among individuals who have limited coping resources, as in the case of Mr. Codd.  Thus, the relationship between stress and level of addiction may be partially explained by impulsivity; meaning that exposure to stress at an early age may contribute to the development of impulsive traits, and these traits predict greater drug use.[12]

There is an accumulating body of evidence that suggests a strong relationship between stress and drug use and relapse among cocaine addicts.  Reports suggest that stressful life events can precipitate relapse and are parallel to increased cravings in cocaine-dependent individuals. Increased symptoms of stress, anxiety, depression, and other psychopathology is associated with an increased risk of cocaine craving, use and relapse.[13]  Mr. Codd indicated stressful events that precipitated a history of relapse, namely unresolved grief of the death of his best friend, an ex-girlfriend's overdose, his divorce, involvement in family court, and the loss of custody of his daughter.  Decision-making also plays a key role in psychostimulant relapse.  Pervasive decision-making problems in individuals with substance use disorders may relate to abnormalities in the processing of emotional signals that work to anticipate the prospective outcomes of potential decisions. Successful decision making depends on the ability to efficiently learn from choices that are rewarded versus those that are not, a skill that may be compromised in stimulant-using individuals.  Reduced ability to differentiate advantageous versus disadvantageous options may be due to the fact that stimulant abuse and dependence are associated with heightened responsivity to drug-related rewards; discounting of delayed

---

[12] E. Ross, J. Yoon, J. Mahoney III, Y. Omar, T. Newton & R. De La Garza II. (2013). The impact of self-reported life stress on current impulsivity in cocaine dependent adults. *Progress in Neuro-Psychopharmacology & Biological Psychiatry,* 46, 113-119.
[13] J. Mantsch, O. Vranjkovic, R. Twining, P. Gasser, J. McReynolds & J. Blacktop. (2014). Neurobiological mechanisms that contribute to stress-related cocaine use. *Neuropharmacology,* 76, 383-394.

monetary rewards in favor of riskier, more immediate payoffs; and impaired learning of stimulus-reward associations.[14]

**LEGAL HISTORY**

Mr. Codd reported involvement with the criminal justice system from the young age of 15, when he was arrested for and falsely accused of attempted murder.  The charges were ultimately "dropped" at the age of 17 due to lack of evidence.  He was arrested again at the age of 18, for a "neighborhood fight", was arrested for assault in the second degree and sentenced to one year in custody on Riker's Island.  He denied all infractions and maintained a job for the duration of his sentence.  Between the ages of 19 and 29, Mr. Codd reported minimal contact with law enforcement other than violations (non-criminal offenses). At the age of 29, Mr. Codd was arrested on two occasions for criminal mischief, in which he "grabbed" his wife's cell phone and threw it during a verbal altercation, and for resisting arrest, after he violated an active order of protection by going to his home.  He was placed on three years' probation.  At the age of 31, he was arrested for operating a motor vehicle while impaired by drugs and sentenced to one year conditional discharge and 6 months license revocation.   There is additionally a disorderly conduct charge at the age of 32, for which was disposed as a conditional discharge.  Mr. Codd reported the instant offense occurred while undergoing divorce, custody proceedings, leading to intensive mental health symptoms, which he attempted to self medicate with an significant increase in substance use.

---

[14] Raske, M. Stewart, J., Flagan, T. & Paulus, M. (2015). Attenuate neural processing of risk in young adults at risk for stimulant dependence. *PLoS ONE*, 10(6), 1-23.

**MENTAL HEALTH HISTORY**

Mr. Codd described a long history of mental health symptoms that began in childhood. He described his mother had a very anxious personality growing up, his sister exhibited mood instability and negative behaviors in the home, and his father emotionally "shut down," causing family dysfunction.  When he was approximately 10 years old, his sister was diagnosed with bipolar disorder, which for Mr. Codd, prompted the onset of symptoms consistent with anxiety. He described experiencing a consistent pattern of negative thoughts, always feeling bad about himself, feelings of nervousness, sweating, and shaking.  He denied significant episodes of tearfulness and isolative behaviors and instead, described "suppressing" everything he felt.  Mr. Codd additionally suffered as a result of his mother's anxiety disorder, stating, "she would worry and then I would worry more."  He admitted using substances helped reduce his anxiety.

While in treatment in Florida, Mr. Codd successfully completed the Department of Children and Families Certified Batterer's Intervention Program at Dade Family Counseling, located in Florida, on November 12, 2019.  He additionally completed the Parenting Wisely course of study for improving family relationships on March 18, 2020.

Four months prior to the instant offense, Mr. Codd sought out psychiatric care to address increasing symptoms of anxiety related to his separation from his wife.  He was under the care of Dr. Leon Valbrun, who diagnosed Mr. Codd with an anxiety disorder and attention deficit hyperactivity disorder.  He was prescribed 4mg Xanax daily and 30mg Adderall daily.  In November 2020, Dr. Valbrun was arrested for and indicted on 16 counts of criminal sale of a prescription for a controlled substance,[15] therefore medical records are unable to be obtained.

---

[15] Office of the Special Narcotics Prosecutor for the City of New York. (November 24, 2020). Manhattan Psychiatrist and Medical Assistant Arrested in Illegal Sales of Prescriptions for Addictive Controlled Substances https://snpnyc.org/wp-content/uploads/2020/12/11-24-20-Manhattan-Psychiatrist-and-Medical-Assistant-Arrested....pdf

Since being incarcerated and detained at MDC, Mr. Codd has been under the care of Dr. Lawrence Bryskin and was initially prescribed Buspar, Zoloft, and Propranolol, all to treat his anxiety disorder.  He reported a follow up appointment with Dr. Bryskin on Wednesday, June 23, 2021, when he was prescribed 20mg Celexa and 100mg Lamictal daily for mood stability.

**COLLATERAL INTERVIEW WITH JOANN CODD**

Mrs. Joann Codd is the mother to Mr. Codd who corroborated much of the information contained in this memorandum.  She described before her son was born, she and her husband were building a home on Staten Island.  She reported for approximately 6 months during construction, she resided at a friend's house with her two older children and rarely saw her husband, as he would work during the days and build at night.  She described financial, relocation, and relationship stress during this time, which subsided and naturally resolved itself after completion of their home.  She denied a history of counseling or use of medications during this time and admitted the increased stressors contributed to feelings of worry, nervousness, tension and uneasiness.

Mrs. Codd reported a typical birth and a traumatic first two weeks.  She described when Mr. Codd was 10 days old, he spiked a fever of unknown origin of 105 degrees.  She spent several days in the hospital with him, worrying about the fate of his future.  She stated, "I was worried about him surviving.  I had never been so traumatized before."  Thankfully, he recovered with no complications.  Mr. Codd spent the first five months living in an attic of his mother's friend's house, with his mother and two siblings, before moving into the family home in December 2020.

When Mr. Codd was in Kindergarten, Mrs. Codd returned to work.  She reported she preferred to stay home and raise her children, but she and her husband were sending three children to private school and finances no longer afforded her the option to stay home.  She continued her education and became a high school vice principal.  Mrs. Codd believes her return to work affected her son.  She reported he had difficulty toilet training and with the pressure of her return to work, she exacerbated his challenge with a period of impatience.  In addition, she reported less time together and less attention to be paid to him may have also impacted him.

Mrs. Codd described her son as extremely personable, with a "fantastic smile".  She stated, "everyone loved him" and he maintained the most friends out of his siblings.  She described raising her children in a close knit community, but the family endured the consequences of economic disparity.  She reported a feeling of "not belonging" and a feeling of being uncomfortable, especially regarding finances.  Mr. and Mrs. Codd always participated in their children's lives, sports, and activities, but Mrs. Codd admitted to "sheltering" them and at times feeling "paranoid" about their safety.  Mrs. Codd denied significant periods of time exhibiting symptoms of anxiety and it is believed and demonstrated that feelings of nervousness and worry coincided with significant stressors or developmental disruptions.  Mrs. Codd has relied on her faith and her strong familial foundation to maintain her mood and attitude throughout difficult periods in her life.

Mrs. Codd described her son was an average student, who was never in trouble and always had support around him.  She described an unremarkable educational history until he was falsely accused of attempted murder at the age of 15.  Mrs. Codd described a period of mental health challenges, which was due to a traumatic, painful, hurtful, challenging two years defending her son.  The family remortgaged the house and spent "hundreds of thousands of

dollars" to defend him and his name.   Initially, she struggled to cope, lost 30 pounds, was continuously tearful, and was harassed and threatened.   She briefly attended therapy with her son and focused on "getting through the days."   She reported Mr. Codd "couldn't even believe what was happening" in the beginning and was "scared to death."   Over time, he developed resilience, and became confident and calm.   Mrs. Codd eventually went back to work but felt like she was "surrounded by the enemy."   Mrs. Codd reported the bad notoriety eventually became her son's persona, which she believes was for "survival."   After this incident, Mrs. Codd noticed her son no longer had confidence or self-esteem.   She reported everything in his life became based on a perception of him.   She reported family members turned their backs on them and she distinctly reported her son has "never since smiled the way he used to."   Mrs. Codd believes everything that has happened to her son since, is directly correlated to him being falsely accused at the age of 15.

Over the years, Mrs. Codd reported wonderful memories and qualities in her son.   She reported he is very talented and has a keen ability to fix things.   He is a great communicator, and he has never been fired from a job.   He was able to buy a home, was married, and had a baby. Despite getting divorced, Mrs. Codd described when he was able to buy and renovate his own home, it was the "happiest time in his life."

Mrs. Codd confirmed her son struggles with substance use and reported at times it was "very bad," purchasing Narcan in the event of an emergency, which, her son Kevin on one occasion used to revive Mr. Codd after an overdose.   She reported he attended treatment and always did well while he was in a program.   Prior to the COVID-19 outbreak, Mrs. Codd reported her son was attending outpatient treatment at the Staten Island YMCA and family court hearings were proceeding positively.   She reported when group counseling and drug testing were

suspended, Mr. Codd quickly relapsed (as detailed in the substance use history section, it has been confirmed that counseling sessions were never suspended).  At that time, he was involved in a relationship with a woman who unfortunately overdosed, and Mrs. Codd reported her son struggled to cope with this.

Mrs. Codd believes her son was under the influence of an increase of drugs and alcohol the day of the instant offense.  Her primary mission is to support her son, and she relies heavily on her faith and her familial foundation to support herself and her husband, who she cares for due to his extensive medical needs and debilitating health.  Mrs. Codd is not presently attending treatment or taking prescribed medications.  She presented in session with insight, a strong support system and familial foundation, dedication to her son and family, and is of sound mind and judgement.

**COLLATERAL INTERVIEW WITH THOMAS KAHIL**

Mr. Thomas Kahil is a childhood friend of Mr. Codd.  During his collateral phone interview, he reported knowing Mr. Codd since they were 4 years of age, meeting in school.  He reported their families have vacationed together and they refer to one another's parents as "aunt and uncle," signifying their close relationship.

Mr. Kahil reported when Mr. Codd is sober, he is productive, has a good work ethic, maintains close relationships with family, is dependable, and is trustworthy.  He continued he has always been a great friend who unfortunately battles addiction.  Prior to the instant offense, he reported Mr. Codd was attending programs and counseling to regain custody of his daughter, whom he is a great father to.  Mr. Kahil admitted he distances himself from Mr. Codd when he is actively using, and as a realist, knows Mr. Codd has a significant amount of work to do to regain

control of his life.  He is hopeful Mr. Codd will be afforded the opportunity to attend treatment and believes he deserves the chance.


**COLLATERAL INTERVIEW WITH MAURA CODD**

Ms. Maura Codd is the older sister to Mr. Codd by 5 years.  During her collateral phone interview, she described a good childhood with a strong family foundation.  She remembered her parents sacrifices so she and her siblings would be able to attend Catholic school and she remembered her mother returning to work when she was approximately 12 years of age, to lessen the financial burden on her father.  She remembered her mother making lunch daily, and spending quality time at the park, in the woods, and on nature walks.  Ms. Codd reported traumas of her own that she declined to discuss or elaborate on.

Ms. Codd described her brother as "cute, smiley, and happy" when he was younger.  She reported he loved being with his siblings and she characterized him as "kindhearted and thoughtful."  She admitted when she was younger being "caught up in [her] own life" and therefore did not spend much time with Mr. Codd.  She reported he took over her paper route when he was younger and has always been well-liked.

Ms. Codd confirmed and detailed the personal and family struggles and challenges when Mr. Codd was falsely accused of attempted murder.  She stated, "that is when he changed.  He started to believe he was bad, and he defended himself by becoming bad and embracing that persona."  Over time, Ms. Codd reported her brother eventually "came back from that."  Ms. Codd confirmed her brother broke his back but denied knowing he had an opiate addiction until she received a call from a girlfriend stating that he overdosed.

Ms. Codd described the best time in her brother's life was when he was engaged to Victoria, building a family, and renovating their house. She stated, "he felt like he had the life he was supposed to have." Unfortunately, their relationship did not last, and Mr. Codd suffered financially and emotionally. She reported not knowing the details of their relationship, but stated her brother was "devastated." Ms. Codd believes her brother uses substances to cope with and escape the pain and trauma he has endured as a teenager and then due to the complications of his marriage, which led to his separation from his child.

**CLINICAL ASSESSMENT**

Joseph Michael Codd is a 34-year old single, Caucasian male. He presented in video conference sessions as neatly groomed, of average build, dressed in a correctional uniform, and with an anxious, yet cooperative demeanor. He maintained appropriate eye contact and displayed increased psychomotor behavior. He spoke at a pressured rate of speech with clear clarity and ordinary intensity of volume and flow. He presented with an anxious affect and his mood was appropriate to the situation. He displayed adequate attention and concentration. He demonstrated intellectual awareness and emotional insight into his current situation. He accepted and detailed his episodes of lapse in decision making and judgment due to increased stress combined with a history of trauma, loss, mental illness and substance use, for which he is now aware of and accepts. His thoughts were consistent with reality and there is no evidence of a thought disorder. He denied all current high-risk symptoms including suicidal and homicidal ideation, intent and plan.

Based on our clinical experience and working with the offender population, it is our conclusion that Mr. Codd has suffered from the underlying psychological effects brought about

by the stressors associated with his developmental history, trauma, and adversity.  His trauma

commenced when he was falsely accused of a violent crime at the age of 15, which is a pinnacle

identity stage (adolescence), the killing and loss of his best friend at as a young adult, which

contributed to an escalation of his mental illness and substance use. A few years later his

marriage and the birth of his daughter, lead to the presence of post partum depression in his wife,

leading into a break in communication, which eventually created a complex marriage and then

led to a chaotic divorce and the loss of custody of his first and only child. All of which have

markedly influenced his socio-emotional development and led to functional changes in the brain,

influencing later decision-making skills, cognitive processing ability and levels of distress

tolerance.  Mr. Codd's ability to mediate cognitions and emotions has been dramatically

impacted, significantly affecting global decision making and cognitive processing skills, and as a

youngster, resorted to substance use, negative peer influence, impulsivity, and criminality to

cope with distress and to regulate his emotions.

In the recent months leading to the instant offense, Mr. Codd's decision-making skills,

cognitive processing skills, attention, focus, and concentration were all impacted by the end of

his relationship and loss of his daughter, combined with the unresolved grief from the death of

his best friend, and girlfriend's overdose in his apartment.  Early stress combined with new

stressors compromised Mr. Codd's overall judgment, resulting in the current incident.

**RELEVANT RESEARCH RELATED TO MITIGATING FACTORS**

***Effect of Prenatal and Maternal Psychopathology***

The prenatal period is a time of rapid development during which the fetus is especially

vulnerable to both positive and negative influences that can have lasting consequences on

development across the lifespan.  During periods of rapid cell division, organs are especially vulnerable to environmental influences such as stress.[16]  Exposure to prenatal stress has been shown to alter the neurobiology and behavior of offspring and is associated with fearful and depressive-like behaviors, more abnormal social behavior, increased stress activity and more irritable temperament.[17]  Children exposed to prenatal maternal psychological distress may be particularly vulnerable to increases in reactive behavior, emotional difficulties and poor attention regulation in infancy and toddlerhood.  These early effects appear to have consequences for the developing brain with effects that persist over time.[18]  Research has demonstrated that pregnancy-related anxiety may be associated with difficulty regulating emotion and behavior in addition to a higher risk for developing psychological disorders including anxiety and depression in later life, as in the case of Mr. Codd.[19]  Mrs. Codd reported a history of intermittent anxious mood and increased stress during pregnancy, namely living in a friend's house while her husband built the family's home.  This increased stress combined with a pre-existing anxiety disorder may help to explain the transmission of related symptomatology to her son.

Anxiety disorders represent one of the most pervasive mental health problems, with prevalence rates in children at approximately 10%.  They tend to be chronic and are associated with a variety of psychological issues throughout the course of development.[20]  Empirical evidence supports multiple influences on childhood anxiety, including temperament, parent

[16] Blair, M.M., Glynn L.M., Sandman, C.A. & Poggi Davis R. (2011). Prenatal maternal anxiety and early childhood temperament. *Stress,* 14(6), 644-651.

[17] Blair, M.M., Glynn L.M., Sandman, C.A. & Poggi Davis R. (2011). Prenatal maternal anxiety and early childhood temperament. *Stress,* 14(6), 644-651.

[18] Blair, M.M., Glynn L.M., Sandman, C.A. & Poggi Davis R. (2011). Prenatal maternal anxiety and early childhood temperament. *Stress,* 14(6), 644-651.

[19] Blair, M.M., Glynn L.M., Sandman, C.A. & Poggi Davis R. (2011). Prenatal maternal anxiety and early childhood temperament. *Stress,* 14(6), 644-651.

[20] Broeren, S., Muris, P., DIamantopoulou, S. & Baker, J.R. (2013). The course of childhood anxiety symptoms: Developmental trajectories and child-related factors in normal children. *Journal of Abnormal Child Psychology,* 41, 81-95.

psychopathology, parenting practices, family environment and community factors.[21] Developmental pathways of anxiety disorders are thought to result in less effective styles of emotion regulation, rendering the child vulnerable to maladaptive coping responses when faced with stress.[22] Emotion regulation is the cognitive process involved in monitoring, evaluating, and modifying emotional reactions to achieve a particular goal. Individuals with ineffective emotion regulation skills often develop behavior problems, interpret stimuli negatively and exhibit impaired cognitive processing.[23] As in the case of Mr. Codd, emotion regulation skills developed in childhood later resulted in the development of poor decision-making and maladaptive coping, namely, substance use and criminality.

### Impact of Trauma and Adversity

The harmful effects of childhood and adolescent adversity on a number of physical and emotional health related outcomes are well established. Adverse early life experiences have long-lasting effects on brain function, cognitive, and emotional development, and influence the risk to develop stress-related psychopathology later in life. Humans grow up in a given socio-economic setting and during early life, they are influenced by many factors such as the extent and quality of parental care, cognitive stimulation, nutrition, and social and financial status. These factors can interact and affect neurocognitive development. There is evidence that early life adversity can affect hippocampal, amygdala, and prefrontal cortex volumes and their

---

[21] Mian, N.D., Wainwright, L. Briggs-Gowan, M.J. & Carter, A.S. (2011). An ecological risk model for early childhood anxiety: The importance of early child symptoms and temperament. *Journal of Abnormal Child Psychology, 39*, 501-512.
[22] Hum, K., Manassis, K & Lewis, M.D. (2013). Neural mechanisms of emotion regulation in childhood anxiety. *Journal of Child Psychology and Psychiatry.* 54(5), 552-564.
[23] Hum, K., Manassis, K & Lewis, M.D. (2013). Neural mechanisms of emotion regulation in childhood anxiety. *Journal of Child Psychology and Psychiatry.* 54(5), 552-564.

function, brain regions associated with problem solving, decision-making, impulsivity, and emotion regulation.[24]

Exposure to childhood adversity is associated with many forms of psychopathology. Children exposed to adversity are more likely to develop anxiety disorders, depression, externalizing problems, substance use and psychosis, than children who have never experienced adversity, and this risk increases as the degree of adversity increases.[25]  Early adversity also impacts behavioral and neural systems central to attention, executive functions, and emotion processing, processes that are integral to associative learning.[26]  If associative learning is impaired, children are likely to have difficulties adjusting their behavior in dynamic social interactions.  Research has indicated that children and adolescents who suffer early adversity are impaired in the ability to detect important environmental cues and adjust their behavior accordingly.[27]  Individuals exposed to early adversity are less able than their peers to correctly learn what environmental stimuli result in reward, which may have implications for Mr. Codd's later poor choices, lapses in judgment and lack of control in difficult situations.

The long-term effects of childhood trauma include alterations in stress systems. Childhood trauma has been linked to permanent alteration of the hypothalamic-pituitary-adrenal (HPA) axis with damaging effects on the developing brain which may lead to behavioral problems later in life.  Childhood trauma interferes with stress-regulatory genes resulting in poor

[24] Krugers, H., Arp, J., Xiong, H., Kanatsou, S., Lesuis, S., Korosi, A., Joels, M. & Lucassen, P. (2017). Early life adversity: lasting consequences for emotional learning. *Neurobiology of Stress,* 6, 14-21.
[25] McLaughlin, K., DeCross, S., Jovanovic, T. & Tottenham, N. (2019). Mechanisms linking childhood adversity with psychopathology. *Behaviour Research and Therapy,* 118, 101-109.
[26] Hanson, J., van den Bos, W., Roeber, B., Rudolph, K., Davidson, R. & Pollak S. (2017). Early adversity and learning: implications for typical and atypical behavioral development. *Journal of Child Psychology and Psychiatry,* 58(7), 770-778.
[27] Hanson, J., van den Bos, W., Roeber, B., Rudolph, K., Davidson, R. & Pollak S. (2017). Early adversity and learning: implications for typical and atypical behavioral development. *Journal of Child Psychology and Psychiatry,* 58(7), 770-778.

decision-making performance.   Early life stress can induce persistent changes in stress neurotransmitters and the serotonin system.  Both are crucial for correct decision-making.  Early adversity impairs the normal development of these biochemical pathways and consequently leads to altered decision-making.[28]

*Adversity and Substance Use*

Adverse childhood experiences have been shown to be associated with later poorer physical and general health, and more recently, emotional health as well as an elevated prevalence of substance use problems[29] and delinquency.[30]  Childhood adversity may lead to the development of risk-taking behaviors, including substance use and delinquency.[31]  Research has demonstrated a strong bidirectional link between drug use and delinquency, such that substance use is associated with criminal and delinquent behaviors in adolescence and early delinquency precipitates initiation into later drug use.[32]  Studies have shown that prisoners with a history of both drug dependence and greater exposure to childhood adversity were found to initiate substance use and enter the criminal justice system at earlier ages,[33] a statistic applicable to Mr. Codd, who first became involved in the criminal justice at 15 and was first incarcerated at the age of 18.  Substance use is a maladaptive coping response strongly related to unstable and

[28] Guillaume, S. Perroud, N., Jollant, F., Jaussent, I., Olie, E., Malafosse, A. & Courtet, P. (2013). HPA axis genes may modulate the effect of childhood adversities on decision-making in suicide attempters. *Journal of Psychiatric Research,* 47, 259-265.

[29] Wolitzky-Taylor, K., Sewart, A., Vrshek-Schallhorn, S., Zinbarg, R., Mineka, S., Hammen, C., Bobova, L., et al. (2017). The effects of childhood and adolescent adversity on substance use disorders and poor health in early adulthood. *Journal of Youth and Adolescence,* 46, 15-27.

[30] Brown, S.M. & Shillington, A.M. (2017). Childhood adversity and the risk of substance use and delinquency: The role of protective adult relationships. *Child Abuse and Neglect,* 63, 211-221.

[31] Brown, S.M. & Shillington, A.M. (2017). Childhood adversity and the risk of substance use and delinquency: The role of protective adult relationships. *Child Abuse and Neglect,* 63, 211-221.

[32] Brown, S.M. & Shillington, A.M. (2017). Childhood adversity and the risk of substance use and delinquency: The role of protective adult relationships. *Child Abuse and Neglect,* 63, 211-221.

[33] Levenson, J. & Grady, M. (2015). Childhood adversity, substance abuse and violence: Implications for trauma-informed social work practice. *Journal of Social Work Practice in the Addictions,* 16, 24-45.

defective forms of emotion-based coping, such as avoidance and denial.  Negative emotions prompt cognitive and behavioral efforts aimed at managing, minimizing, or eliminating the problem, or the emotion itself.  As a result, an individual will engage in substance use to cope to the extent that they believe substances can enhance their social and emotional experience.[34] Regardless of the motivation for consumption, alcohol and substance use negatively impacts a person's internal state.  This includes experiences of depressed mood, increased perceptual and cognitive distortions, increased arousal, symptoms of withdrawal, physical consequences, social and financial stress, and increased risk for illness and injury.[35]

### Adolescent Brain Development

Adolescence is widely regarded as a unique period in the human and animal lifespan, one in which critical life tasks related to behavioral self-organization, the pursuit of relationships outside of the family, and identity formation are accomplished, all of which lead to adaptive, independent living.  Adolescence is a period with increased risk-taking and is associated with increased vulnerability to psychopathology, particularly with respect to affective disorders, substance abuse, and psychosis.[36]  Researchers studying adolescent brain development conclude that the entire brain is maturing during adolescence as functional networks become more efficient.  Within structural brain development, nearly every tissue compartment is changing during adolescence.  Functional networks are being sculpted during adolescence in a manner that increases information processing efficiency.  Hormones are changing, the stress system is

---

[34] Cooper, M. L., Frone, M. R., Russell, M., & Mudar, P. (1995). Drinking to regulate positive and negative emotions: a motivational model of alcohol use. *Journal of personality and social psychology*, *69*(5), 990.

[35] Gregg, L., Barrowclough, C., & Haddock, G. (2007). Reasons for increased substance use in psychosis. *Clinical psychology review*, *27*(4), 494-510.

[36] Editorial. (2010). Adolescent brain development: current themes and future directions. Introduction to the special issue. *Brain and Cognition,* 72, 1-5.

changing, and neurochemical system functioning is altered as well.  The brain's capacity to regulate behavior is a function of its structural integrity, which contributes to synaptic architecture and neurochemical tone, all of which is underdeveloped, immature and weakened in the adolescent brain.  Themes that arise out of adolescent brain development research include: 1. Adolescents demonstrate heightened sensitivity to environmental cues; 2. Adolescents do not consistently exert behavioral control when confronted with these cues, nor do they manage their own reactions well; 3. These responses are highly subject to individual differences. [37] Researchers have suggested that the relative immaturity of the adolescent brain may make it particularly sensitive to stress-induced dysfunctions, with both immediate and lasting consequences on mental health.

Emerging adulthood is the unstable and transitory period of life from 18 to 24 years of age and coincides with the developmental stage known as the "sorting period" of adulthood.[38] The adolescent years contextualize the nature of emerging adulthood, and the process of transition occurring during this period has important implications for adult adjustment.  Life course framework theorizes pathways through life that include important transitions or developmental turning points during which individual trajectories can stabilize or change.[39] Some researchers have gone so far as to call emerging adulthood a "critical juncture" when events and experiences become "markers" in the lifespan contributing more to individual development than previous or subsequent periods. [40]   Research has demonstrated that the

---

[37] Editorial. (2010). Adolescent brain development: current themes and future directions. Introduction to the special issue. *Brain and Cognition,* 72, 1-5.
[38] Williams, A. & Merten, M. (2015). Characteristics of early community adversity, social resources, and adolescent long-term mental health. *Journal of Community Psychology,* 43(2), 125-141.
[39] Williams, A. & Merten, M. (2015). Characteristics of early community adversity, social resources, and adolescent long-term mental health. *Journal of Community Psychology,* 43(2), 125-141.
[40] Williams, A. & Merten, M. (2015). Characteristics of early community adversity, social resources, and adolescent long-term mental health. *Journal of Community Psychology,* 43(2), 125-141.

development of adjustment and mental health problems during adolescence often predicts increased problems into young adulthood.  Specifically, researchers have found that adolescent internalizing and externalizing symptoms remained moderately stable into young adulthood.[41] Longitudinal research suggests that a variety of behavioral problems in adolescence often predict adjustment into adulthood, setting the stage for a variety of negative outcomes, including substance use, externalizing disorders and risky and impulsive behaviors,[42] as in the case of Mr. Codd.  It is evident that Mr. Codd's false accusation and two year court proceedings set the foundation for later challenges, poor self-esteem, mental illness, difficulty coping, poor judgment, and lack of critical thinking skills.  The relative immaturity of his brain at that time made it particularly sensitive to the stress related to that incident, with both immediate and lasting consequences on mental health.

**IMPACT OF COVID 19 PANDEMIC ON BOP INCARCERATION**

The United States is currently amid the worst global public health crisis in over 100 years. The United States Secretary of Health and Human Services declared COVID-19 a public health emergency on January 31, 2020.[43]  Rampant coronavirus infection had been found at all levels of corrections – local, state, and federal, with inmates testing positive at disproportionate levels in comparison to the general population.  Researchers at John Hopkins and UCLA published that prisoners are 5.5 times more likely to get COVID-19 and three times more likely

---

[41] Kiff, C., Cortes, R., Lengua, L., Kosterman, R., Hawkins, D. & Mason, W. (2012). Effects of timing of adversity on adolescent and young adult adjustment. *Journal of Research on Adolescence,* 22(2), 284-300.

[42] Kiff, C., Cortes, R., Lengua, L., Kosterman, R., Hawkins, D. & Mason, W. (2012). Effects of timing of adversity on adolescent and young adult adjustment. *Journal of Research on Adolescence,* 22(2), 284-300.

[43] U.S. Dept. of Health and Human Services (Jan. 21, 2020). Determination that a Public Health Emergency Exists.

to die from it.[44]  By May 2020, that number rose to 6.5 times more likely to contract the virus.[45]

Close confinement, limited personal protective equipment and increased risk for cardiac and

respiratory conditions make prison populations especially vulnerable to coronavirus.[46]

According to an article from the Washington Post, the Federal Bureau of Prisons (BOP)

response to the pandemic has been "disastrous and deadly."[47]  The BOP has largely ignored

health guidelines.  At the onset, correctional officers who had been exposed to the virus were

required to work despite a lack of protective equipment.  Despite former Attorney General

William P. Barr's call to release inmates to home confinement, the BOP and federal prosecutors

have been opposing such requests and using current plea agreements to restrict future requests.

As cases continue to rise across the nation, those who are incarcerated continue to be at risk and

at the mercy of the BOP.[48]  In the Metropolitan Detention Center (MDC) specifically, reporters

have documented that MDC deviated from the Center for Disease Control guidelines by not

screening many new arrivals; failed to check the temperatures of inmates regularly enough;

---

[44] Alexandra Sternlicht (July 8, 2020). Prisoners 550% more likely to get COVID-19, 300% more likely to die, new study shows. Retrieved from https://www.forbes-com.cdn.ampproject.org/c/s/www.forbes.com/sites/alexandrasternlicht/2020/07/08/prisoners-550-more-likely-to-get-covid-19-300-more-likely-to-die-new-study-shows/amp/

[45] Douglas G. Morris (July 2, 2020). Covid in the prisons.  Retrieved from https://www.nybooks.com/articles/2020/07/02/covid-19-in-prisons/

[46] Alexandra Sternlicht (July 8, 2020). Prisoners 550% more likely to get COVID-19, 300% more likely to die, new study shows. Retrieved from https://www.forbes-com.cdn.ampproject.org/c/s/www.forbes.com/sites/alexandrasternlicht/2020/07/08/prisoners-550-more-likely-to-get-covid-19-300-more-likely-to-die-new-study-shows/amp/

[47] Chwalisz, N. (August 7, 2020). The federal bureau of prisons response to the coronavirus has been disastrous and deadly.  Retrieved from https://www.washingtonpost.com/opinions/local-opinions/the-federal-bureau-of-prisons-response-to-the-coronavirus-has-been-disastrous-and-deadly/2020/08/06/3d30464c-d65b-11ea-aff6-220dd3a14741_story.html

[48] Chwalisz, N. (August 7, 2020). The federal bureau of prisons response to the coronavirus has been disastrous and deadly.  Retrieved from https://www.washingtonpost.com/opinions/local-opinions/the-federal-bureau-of-prisons-response-to-the-coronavirus-has-been-disastrous-and-deadly/2020/08/06/3d30464c-d65b-11ea-aff6-220dd3a14741_story.html

failed to monitor their heart rate and blood oxygenation at all; failed to screen for symptoms (such as fatigue, shortness of breath, or coughing); generally ignored sick-call requests from inmates or waited days before responding; and regularly destroyed sick-call requests (an apparent intentional destruction of medical records and a gross deviation from basic health care standards).

On June 3, 2021, Chief Judge Margo K.Brodie, of the Eastern District of New York, issued an administrative order (No.2020-14) "that the MDC and MCC respond to concerns about the institutions' response to the COVID-19 pandemic"[49]. The order also included "a running tally" of the statistics of the impact of COVID on inmates. It summarized in part that 8,992 inmates were tested and only 583 were vaccinated.

Mr. Codd prepared a summary of his experience with COVID while detained in MDC from the period of October 26, 2021 to June 10, 2021, which is attached to this memorandum, where he documented the hardships he experienced and the conditions he has been exposed to due to the COVID-19 pandemic.  He notes that on October 26, 2020, he is on quarantine and is allowed out of his cell for half an hour, three times a week. On November 26, 2020, he is on a 23 hour "lock down" and "forced to bunk with person mental problems"." Mainline food was served on the same cart as garbage was collected on and was never sanitized or cleaned". December 26, 2020, he states that there is "continued 23 hour lock in". "Grew extremely depressed and asked for additional medical assistance and was denied".  Mr. Codd continues to depict 23 hour "lock in(s)" and having limited clothing, "only two pairs of underwear, one t-shirt", he also notes "30 minute(s)(to)shower, phone call, clean, exercise=mental trauma". On June 10, 2021 he states that he was "forced into solitary confinement in the name of social

---

[49] https://www.nyed.uscourts.gov/pub/bop/20210604_BOP_Report.pdf

distancing", "guards not wearing masks" and "on psych meds and denied follow up with psych for re-evaluation.

**SENTENCING RECOMMENDATIONS**

It is evident Mr. Codd has struggled with positive identity formation after the age of 15, stemming from his two year involvement in the criminal justice system for being falsely accused of a crime at the age of 15.  As a result, he has endured a series of negative experiences throughout his development, suffering significant physical, physiological, and psychological consequences.  He has additionally struggled with persistent anxiety and a substance use disorder.  From a young age, he has struggled with meager emotional resources and difficulty in affect modulation, which manifested in an early-onset substance use, impulsivity, poor decision-making, emotion dysregulation and mental health challenges.  He developed a maladaptive set of coping and problem-solving skills to manage the pain associated with negative experiences. Early-onset substance use combined with trauma and loss, led to poor developmental functioning and identity formation, putting him at increased risk for criminality.  Without proper skill development, which were greatly hampered by the trauma he endured as a teenager, Mr. Codd resorted to impulsive means and actions, as he lacked the ability to employ prosocial coping, problem solving, and decision-making skills, leading to his involvement in the current matter.

***Impact of Long Term of Incarceration***

Should Mr. Codd be sentenced to a long term of incarceration he will be exposed to various irrevocable consequences that will affect him, his immediate family and young daughter who is still in her infant stage. Long-term incarceration poses consequences for not only the

individual, but also for family and interpersonal relationships.  Individuals with disabilities are often overlooked in correctional facilities and are at an increased risk for inadequate rehabilitation, specifically for complex substance use and co-occurring mental health treatment and safety while incarcerated.[50]  Covert disabilities including cognitive, intellectual, or mental health impairments often prevent individuals from receiving required structured treatment by licensed professionals while incarcerated.  The associated lack of accommodations for individuals with disabilities further exacerbates mental illnesses, which are associated with anti-social behavior, decreases in health and functioning, victimization, negative outcomes for inmates and institutional safety, and increased risk of recidivism –all which Mr. Codd will be exposed to should he be sentenced to an extended period of incarceration.

Contact with the criminal justice and penal system after a felony conviction affects an individual's potential of obtaining employment and social support in two ways: inmates are unable to develop normal credentials while in prison, including a work history, marketable skills, and social capital; and incarceration itself constitutes a negative credential that is far more difficult to overcome than a skill deficit or time spent out of the labor force.  To many employers, the mark of a prison sentence signals unreliability, and few are willing to take the chance of hiring an applicant with a criminal record.  Studies have documented that suffering a felony conviction and imprisonment has a permanent impact on earning potential, diminishing men's earnings by up to 30 percent even long after leaving prison.[51]

Children of incarcerated parents suffer greatly by their parent's absence, loss of emotional resources, exposure to limited access of caregivers at home, and then a sense of stigma

---

[50] Blank, P. (2017). Disability in prison. *Southern California Interdisciplinary Law Journal, 26*(2), 309-322.
[51] Schnittker, J. & John, A. (2007). Enduring stigma: the long-term effects of incarceration on health. *Journal of Health and Social Behavior,* 48, 115-130.

and shame once the parent is re-integrated into their home and community.[52]   Parental incarceration is associated with harmful effects on childhood cognitive, mental, and behavioral health, including learning disabilities, attention problems, behavioral or conduct problems, developmental delays, and speech or language problems.[53]   Adult family members of incarcerated people are also affected.  Detrimental health effects may result from disruptions in household functioning.  The family may experience other costs associated with the incarceration and related shame and stigma.  Parents of adult children who are imprisoned may also become the primary of secondary caregivers for their grandchildren.[54]

### *Reentry recommendation and conclusion*

A specific and direct way to ensure minimal risk for recidivism and produce a productive member of society, it is imperative to limit the negative impacts of incarceration on Mr. Codd.  It is recommended that Mr. Codd be placed in a RDAP BOP facility, so he can continue on the psychotropic medication he is presently on and gain further knowledge on how her can recover from his severe substance abuse. It is essential for him to have access to mental health and substance use treatment, so he can focus on unresolved emotional challenges, building a solid foundation of healthy coping, problem solving and decision-making skills, learn critical life skills, and gain a deeper understanding into the current stressors impacting his optimal well-being.  After serving a period of incarceration, he will need access to these supportive services, that include a dual diagnose substance abuse treatment program, which will continue his

---

[52] Gifford, E. (2019). How incarceration affects the health of communities and families. *North Carolina Medical Journal,* 80(6), 372-375.

[53] Gifford, E. (2019). How incarceration affects the health of communities and families. *North Carolina Medical Journal,* 80(6), 372-375.

[54] Gifford, E. (2019). How incarceration affects the health of communities and families. *North Carolina Medical Journal,* 80(6), 372-375.

treatment and also provide mental health treatment, to successfully achieve his short- and long-term goals, things he continues to possess and strive towards, including regaining custody of his daughter and resuming employment.

We do not intend on negating the alleged behavior that led to his arrest, but respectfully request that the Court and United States Attorney's Office consider the existing mitigating factors in the report and acknowledge that an extended period of incarceration is not intended for an individual like Mr. Codd, given his lengthy and complex developmental, substance use and mental health history. Sentencing Mr. Codd to a period of incarceration that is no greater than necessary will provide him access to mental health counseling and substance use treatment sooner, which will, with confidence, afford him the most successful prognosis to lead a productive, responsible, and law-abiding life. Should he be sentenced to an extended period of incarceration, he and his family will be at an alarming risk of psychological deterioration and will experience a steady decline in social, psychological, and emotional advancement.

The Consulting Project would like to thank the Court and the United States Attorney's Office for its review and consideration of the contents of this memorandum and is hopeful it will concur with our recommendation.

Respectfully submitted,

*/s/ Mandi Budah, LCSW*

Mandi Budah, MA, LCSW
Forensic Social Worker

*/s/ Reynaldo Cusicanqui*

Reynaldo Cusicanqui, BA
Forensic Mitigation Specialist
CONSULTING PROJECT